# In The Matter Of:

## *Alan D. Barr and John Malandruccolo, Jr.  v.*
## *Local 626 Pension and Annuity Plan*

---

*Scott A. Ernsberger*
*June 15, 2005*

---

*Hawkins Reporting Service*
*715 N. King Street, Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

Original File 05PI078.TXT, 23 Pages
Min-U-Script® File ID: 1827401525

**Word Index included with this Min-U-Script®**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALAN D. BARR and
JOHN MALANDRUCCOLO, JR.,
    Plaintiffs,         : C.A. No. 04-1468 KAJ
    v.
CARPENTERS PENSION AND
ANNUITY PLAN OF
PHILADELPHIA AND VICINITY,
successor by merger to
CARPENTERS LOCAL 626 PENSION
AND ANNUITY PLAN,
    Defendant.

Deposition of SCOTT A. ERNSBERGER, taken pursuant to notice, before CAROL DI SERAFINO, Professional Reporter and Notary Public, duly authorized to administer oaths, on WEDNESDAY, JUNE 15, 2005, at 9:58 a.m., held at the offices of GEMGroup, Brandywine Corporate Center, 650 Naamans Road, Suite 303, Claymont, Delaware. There being present:
APPEARANCES:
    JOSEPH M. BERNSTEIN, ESQ.
    800 North King Street, Ste. 302
    Wilmington, Delaware 19801
    Attorney for Plaintiffs

Page 2

APPEARANCES, cont'd:
    TIMOTHY J. SNYDER, ESQ.
    YOUNG CONAWAY STARGATT & TAYLOR
    The Brandywine Building
    1000 West Street, 17th Fl.
    Wilmington, Delaware 19801
    and
    KENT G. CPREK, ESQ.
    JENNINGS SIGMOND
    The Penn Mutual Towers
    510 Walnut Street, 16th Fl.
    Independence Square
    Philadelphia, Pennsylvania 19106-3683
    Attorneys for Defendant

Page 3

INDEX TO TESTIMONY
DEPOSITION OF:                           PAGE
SCOTT A. ERNSBERGER
    Direct by Mr. Bernstein                4

Page 4

[1] SCOTT A. ERNSBERGER, being first [2] duly sworn/affirmed according to law, was [3] examined and testified as follows:
[5] BY MR. BERNSTEIN:
[6] Q: Mr. Ernsberger, we were introduced a few [7] minutes ago. Just for the record my name is Joseph [8] Bernstein. I'm an attorney. And I'm representing two [9] individuals, Alan Barr and John Malandruccolo, who [10] have filed a claim for benefits against Carpenters [11] Local 626 Pension and Annuity Plan which I'm just [12] going to refer to from now on as Local 626 Plan.
[13] A: Okay.
[14] Q: I'm going to be asking you some [15] questions about the involvement of GEMGroup and their [16] relationship between GEMGroup and the 626 Plan, Plan [17] beneficiaries, and if there's any question that you [18] don't understand, just speak up and I'll try and [19] clarify it.
[20] A: Okay.
[21] Q: Do you have any questions so far?
[22] A: None.
[23] Q: First could you tell me your current [24] title with GEMGroup.

Page 5

[1] A: Senior account executive.
[2] Q: Do you report to anyone —
[3] A: Yes.
[4] Q: — within GEMGroup?
[5] A: Yes.
[6] Q: Who do you report to?
[7] A: My direct report is James R. Bell.
[8] Q: And what is Mr. Bell's title?
[9] A: I believe it's Vice President of Client [10] Services.
[11] Q: And as I understand it GEMGroup has more [12] than one office.
[13] A: That's correct.
[14] Q: Is Mr. Bell's office here in Claymont or [15] somewhere else?
[16] A: It's in Pittsburgh, Pennsylvania.
[17] Q: And is that another office of GEMGroup?
[18] A: Yes.
[19] Q: Are there any other offices besides [20] Claymont and Pittsburgh?
[21] A: Yes.
[22] Q: And where is that?
[23] A: We have an office in Oxen Hill, [24] Maryland, and in Towson, Maryland.

Page 6

[1] Q: Now with respect to the Claymont office, [2] is that office self-contained in the sense that the [3] Claymont office handles the administration of pension [4] plans, for example Local 626, and none of the other [5] offices handle 626 business?
[6] A: No.
[7] Q: So more than one office could be [8] involved in administering the Local 626 Plan?
[9] A: Yes.
[10] Q: Is that true? Is that the case [11] actually?
[12] A: Yes.
[13] Q: What about with respect to Delaware [14] participants in the Local 626 Plan? Would Delaware [15] participants come through the Claymont office or be [16] referred to some other office?
[17] A: Delaware participants would come through [18] the Claymont office for servicing.
[19] Q: Now as I understand it up until I think [20] January 1st, 2005 GEMGroup acted as the administrator [21] for the Carpenters Local 626 Pension Plan; is that [22] correct?
[23] A: As a third-party contract administrator. [24] Yes.

Page 7

[1] Q: Could you explain what a third-party [2] contract administrator does.
[3] A: Generally the third-party contract [4] administrator handles the day-to-day operations of the [5] Plan, including servicing the participants, [6] accounting, collections, facilitating with the fund [7] professionals and the Trustees of the Plan.
[8] Q: Okay. Let's talk about the beneficiary [9] side for a minute. If a union member wants to apply [10] for a disability pension and they contact the union, [11] would the union refer them to GEMGroup?
[12] A: Yes.
[13] Q: GEMGroup would send them — [14] Has application forms I take it?
[15] A: Yes.
[16] Q: And would send them whatever application [17] form is appropriate, whether it was a retirement [18] pension or disability pension, or is it all one form?
[19] A: It is all one form.
[20] Q: I want to look at I think it's Exhibit [21] 4.
[22] I'll show you what's been marked as [23] Garnett No. 5, and disregarding who filled out that [24] application, is that the application form that is used

Page 8

[1] for beneficiaries who want to apply for benefits? I [2] know there's Page 3 missing.
[3] A: This looks like the form.
[4] Q: Other than page 3?
[5] A: Yes.
[6] Q: And this form will be used for both [7] retirement pensions and disability pensions —
[8] A: Correct.
[9] Q: — or any other kind of pension benefit?
[10] A: Yes.
[11] Q: Okay. Now as I understand it GEMGroup [12] would send out the applications, review the [13] applications when they came back; correct?
[14] A: Yes.
[15] Q: Did GEMGroup have the authority to make [16] any decisions on the application, on the merits; in [17] other words, should this person get a pension [18] whether it's retirement or disability, or not?
[19] MR. CPREK: In his understanding?
[20] MR. BERNSTEIN: Yeah.
[21] THE WITNESS: In my understanding [22] adjudicating the pension claim was our responsibility, [23] although ultimately all pension awards had to be [24] approved by the Board of Trustees.

Page 9

[1] BY MR. BERNSTEIN:

[2] Q: When you say adjudicating a pension plan [3] was your responsibility, when you get a completed [4] application back, what would you typically do? Who [5] would it go to?

[6] A: Eventually it would go to the Board of [7] Trustees for formal approval.

[8] Q: Before it goes to the Board of Trustees [9] is there anything else that happens within GEMGroup?

[10] A: Initially the pension analyst would do [11] the processing and then there may be a peer review, [12] internal peer review, and then it would come to me to [13] eventually then go to the Board of Trustees.

[14] Q: So your pension analyst, for example [15] Miss Garnett, would make sure the application is [16] completed, in the case of a disability pension make [17] sure their medical records have been received; [18] correct?

[19] A: Yes.

[20] Q: And if a person was applying for a [21] Disability type A pension, make sure that a Social [22] Security award had been received?

[23] A: Yes.

[24] Q: And as I understand it the major

Page 10

[1] difference between a Disability A Pension and a [2] Disability B Pension is that an A Pension requires a [3] Social Security award to have been made but a B [4] Pension does not.

[5] A: That was my recollection. Yes.

[6] Q: Now when all these documents have been [7] gathered by the pension analyst, they go to you? Or [8] there's a peer review? You mentioned something about [9] a peer review.

[10] A: In some cases — we have two pension [11] analysts in the office and sometimes one may check the [12] other one depending on what type of pension it is, how [13] routine it is, and then yes, the next step would be [14] once all the paperwork was considered finalized, it [15] would come to me.

[16] Q: The purpose of peer review would be [17] basically make sure everything is there?

[18] A: Yes, and the math has been done [19] properly.

[20] Q: And then it would come to you?

[21] A: Yes.

[22] Q: And what would you do?

[23] A: I would generally take it to the next [24] Board of Trustees' meeting for formal approval.

Page 11

[1] Q: Now would the Board of Trustees look to [2] you to make a recommendation to them whether a [3] particular application should be approved or not [4] approved?

[5] A: I don't really make a recommendation. [6] Obviously we've prepared the paperwork and if I'm [7] asked, yes, I'll say this complies with the Plan or it [8] does not.

[9] Q: Well, let's —

[10] A: Frankly if it doesn't comply with the [11] Plan it would be denied before it ever went to the [12] Board.

[13] Q: So, in other words, if on your review [14] you find that an application should be denied, what [15] would happen to that application?

[16] A: A denial letter would be issued and that [17] may be even before my review.

[18] Q: Could a pension analyst issue a denial [19] letter?

[20] A: Yes.

[21] Q: Do denial letters have to be approved by [22] the Board of Trustees?

[23] A: No.

[24] Q: And I understand there's an appeal

Page 12

[1] process.

[2] A: Yes.

[3] Q: If somebody gets denied they can appeal [4] to the Board of Trustees.

[5] A: Yes.

[6] Q: So sometimes if someone gets denied and [7] appealed, the Board of Trustees could get that [8] application that way.

[9] A: Could you repeat that.

[10] Q: In other words, if you issue a denial [11] and the applicant appeals, would that go back to you [12] or would that go directly to the Board?

[13] A: I would take that to the Board of [14] Trustees.

[15] Q: Would you typically make a [16] recommendation to the Board of Trustees as to whether [17] the denial should be upheld or not upheld?

[18] A: Only upon request.

[19] Q: So you would simply hand whatever packet [20] there was of information that you'd gathered in a [21] denial case, your denial letter, the appeal letter, to [22] the Board and if they had a question you'd answer it, [23] or if they asked you what your recommendation was [24] you'd give it.

Page 13

[1] A: I would present the information. I'd [2] present the facts.

[3] Q: So for each case where there's an appeal [4] you would inform the Board what the basis of the [5] denial was. Would you also inform them what the basis [6] for the appeal was or would the applicant have to do [7] that?

[8] A: I would do that.

[9] Q: You would do that. Okay. [10] And then the Board would make a decision [11] on it; correct?

[12] A: Either make a decision or defer for [13] additional information.

[14] Q: Okay. Now in the case where it gets up [15] to you and everything is in order and it's approved, [16] the application is approved, you sign off on it, so to [17] speak, what happens in that case after you initially [18] approve it?

[19] A: When you say — I don't approve it.

[20] Q: Okay. But, I mean, you don't deny it.

[21] A: If there's no denial, it goes to the [22] Board of Trustees for approval.

[23] Q: Now do you do the same thing that you do [24] on appeal? In other words, present the application,

Page 14

[1] inform the Board in a summary way what this [2] application is about?

[3] A: Yes.

[4] Q: You do that?

[5] A: (Witness moves head up and down).

[6] Q: And is there any other information other [7] than what you present to the Board that the Board [8] would rely on in making a decision? Do they sometimes [9] ask you for more information?

[10] A: Sometimes.

[11] Q: But that additional information would [12] come through you; correct?

[13] A: Possibly.

[14] Q: Now as I understand it I think it was [15] effective January 1st, 2005, GEMGroup no longer [16] handled the Local 626 Pension Plan; is that correct?

[17] A: I believe we actually provided some [18] accounting services even beyond that date, but [19] generally that was the transition date.

[20] Q: Plan administration stopped as of [21] January 1st, 2005?

[22] A: Generally. Yes.

[23] Q: In other words, taking applications, [24] getting information, reviewing applications, that

Page 15

[1] stopped for the most part?

BARR V. CARPENTERS PENSION PLAN, D DEL 04-1468 KAJ
DEFENDANTS' SUMMARY JUDGMENT APPENDIX

PAGE A – 187

[2] A: I think more accurate would be [3] December 31, 2004. Yes.

[4] Q: And who took over those functions?

[5] A: Records were provided to the fund office [6] of the Philadelphia Carpenters counsel.

[7] Q: So whatever files you maintained here in [8] Claymont after December 31st, 2004 were shipped to the [9] Local in Philadelphia?

[10] A: Yes.

[11] Q: And when I'm talking about files that [12] were kept here by GEMGroup, did those files go all the [13] way back to the inception of GEMGroup's relationship [14] with the Local 626, or were there files that you [15] retained?

[16] A: No. All files were transferred and yes, [17] they did go back to inception.

[18] Q: So everything that GEMGroup had in terms [19] of the administration of the Local 626 Plan as of [20] January 1, 2005 now resides in the Philadelphia office [21] of the union.

[22] A: To the best of my knowledge, yes.

[23] Q: Now I want to show you what has been [24] marked as Garnett No. 6, if you can take a look at

Page 16

[1] that. Have you seen that document before?

[2] A: Yes.

[3] Q: Now I note on the last page of that [4] document, not the last page, but the next — it's Page [5] 3. It's signed by Board of Trustees. Did you play [6] any role in drafting this document?

[7] A: Not that I recall. I'm sure I was part [8] of the review process.

[9] Q: Would you know, if you know, who may [10] have played a role in drafting this particular [11] document?

[12] A: Fund counsel.

[13] Q: And that would be who?

[14] A: Kent Cprek.

[15] Q: Anyone else?

[16] A: Susan Hoffman.

[17] Q: Susan Hoffman?

[18] A: Yes.

[19] Q: Is Susan Hoffman an associate of [20] Mr. Cprek, if you know?

[21] A: No.

[22] Q: Different law firm?

[23] A: Yes.

[24] Q: Do you know which law firm?

Page 17

[1] A: Pepper Hamilton.

[2] Q: I want to refer you to Page 2, and [3] there's a bullet point on Page 2 entitled Pension [4] Starting Dates. Do you see that?

[5] A: Yep.

[6] Q: And I'd just ask you to take a minute [7] and read that to yourself just to refresh your [8] recollection.

[9] A: (Witness complies). Okay.

[10] Q: Now my first question is, there's a [11] statement here. It says, quote, "The Trustees have [12] also adopted clarifying language ..." Was the [13] clarifying language that was adopted in the form of an [14] amendment to the Plan or some other kind of animal, if [15] you know?

[16] MR. CPREK: In his understanding.

[17] MR. BERNSTEIN: If you know.

[18] THE WITNESS: In my understanding it was [19] an amendment to the Plan.

[20] BY MR. BERNSTEIN:

[21] Q: And would that amendment have been [22] adopted around the same time as this letter went out, [23] if you know?

[24] A: Approximately.

Page 18

[1] Q: Do you know — again if you know, if you [2] don't know, that's okay, too — do you know why it was [3] necessary to clarify the issue of pension starting [4] dates by amendment to the Plan? What was the genesis [5] of that, if you know?

[6] A: There was a case, an appeal the Board [7] heard, that consented to clarify that to participants.

[8] Q: With respect to disability pensions, [9] once the pension analyst has all the paperwork [10] together and with respect to a disability pension, [11] that information is all passed along to you to review. [12] That's my understanding.

[13] A: It's passed along to me for the purpose [14] of taking it to the Board of Trustees.

[15] Q: Okay. Well, do you just — [16] Are you just the messenger or do you [17] look at —

[18] A: Depending on the type of pension I may [19] review; I may not.

[20] Q: With respect to disability pensions, [21] would you look at the packet that's given to you to [22] see if there is a Social Security Disability award?

[23] A: Generally, yes.

[24] Q: And if a packet comes to you that does

Page 19

[1] not have a Social Security Disability award attached, [2] what would you do?

[3] A: Would review the file.

[4] Q: Would you send it up to the Board [5] without an award letter or not?

[6] A: Possibly.

[7] Q: Why possibly? Who would make the [8] decision to either send it or not send it?

[9] A: That would be me, and the Plan had a [10] non-occupational disability provision, so didn't [11] necessarily require a disability award.

[12] Q: All right. Well, you get a disability [13] application to look at that's already been sent and [14] there's no Social Security Disability award and I [15] think your answer was sometimes you'd send it up to [16] the Board, sometimes you wouldn't; correct?

[17] A: Correct.

[18] Q: What criteria would you use or what [19] would go into the decision whether to send it up or [20] not send it up?

[21] A: If I reviewed the file and determined [22] that under the Plan there was no entitlement based on [23] the documentation, then it would not go to the [24] Board. There would be a denial letter issued.

Page 20

[1] Q: Okay. So, for example, and this is just [2] hypothetical now, if you get a packet [3] that doesn't have a Social Security award, I assume somebody would [4] look at the medical records that were provided; [5] correct? —

[6] A: Correct.

[7] Q: — and make a determination as to [8] whether initially that person met the criteria for a [9] type B award.

[10] A: No. We would take that definitely to [11] the Board of Trustees. There may be other reasons why [12] they're not entitled.

[13] Q: Could the Board of Trustees to your [14] knowledge award a type A Disability Pension without a [15] Social Security award in place?

[16] A: I don't believe so.

[17] Q: But they could award a type B [18] Disability Pension without a Social Security award in place.

[19] A: Yes.

[20] Q: So in the case where you have a packet [21] that doesn't have a Social Security Disability award, [22] sometimes they would go to the Board and sometimes [23] they would get denied by GEMGroup.

[24] A: Yes.

Page 21

[1] Q: Okay. Now when the disability pension [2] applications that didn't have a Social Security award [3] were presented to the Board, in other words they [4] didn't get flagged by GEMGroup, would you make the [5] same kind of case

presentation to the Board, kind of [6] summarize what the records say or do something, make a [7] pitch?

[8] A: I would present the facts.

[9] Q: You're a neutral fact presenter?

[10] A: Yes.

[11] Q: In other words, you don't advocate [12] either to deny the application or grant the [13] application.

[14] A: No.

[15] Q: But you'll answer questions.

[16] A: Yes.

[17] Q: Okay.

[18] MR. BERNSTEIN: I think that's all I [19] have.

[20] MR. CPREK: No questions.

[21] MR. SNYDER: Nothing.

[23] (Deposition concluded at or about [24] 10:30 a.m.)

Page 22

[1] (Witness excused).

[2] (Deposition transcript was [3] presented to the witness for reading and [4] signing.)

Page 23

STATE OF DELAWARE   )
                    : SS.
NEW CASTLE COUNTY   )

CERTIFICATION

I, CAROL DiSERAFINO, Professional Reporter and Notary Public, do hereby certify that the foregoing deposition of SCOTT A. ERNSBERGER was held before me, pursuant to notice, at the time and place indicated; that said witness was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said witness was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision; and that I am neither of counsel nor kin to any party in said action nor interested in the outcome thereof.

I certify that the foregoing transcript was presented to the witness for reading and signing.

WITNESS my hand at Wilmington, Delaware, this 19th day of July, 2005.

CAROL DiSERAFINO
COURT REPORTER-NOTARY PUBLIC
Cert. No. 182-PS

# ERRATA SHEET
Deposition of Scott Ernsberger

I do hereby certify that I have read all questions propounded to me and all answers given by me on the 15th day of June, before Carol DiSerafino, Professional Reporter and Notary Public, and that:

_____ 1) There are no changes noted.
\_\_X\_\_ 2) The following changes are noted:

Pursuant to Rule 30 of the Federal Rules of Civil Procedure and/or Rule 30(e) of the Delaware Superior Court Civil Rules, both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition . . . with a statement of the reasons given . . . for making them. The deposition shall then be signed by the witness. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. _15_ Line No. _5_ should read: _Records were provided to the Fund Office of the Philadelphia Carpenters Council_

And the reason for the change is: _Misspelling of Council_

Page No. _19_ Line No. _9_ should read: _That would be me, and the Plan had an occupational disability provision so didn't necessarily require a disability award_

And the reason for the change is: _"Non-occupational" should read "occupational"_

Page No. \_\_\_\_ Line No. \_\_\_\_ should read: _____

And the reason for the change is: _____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

Sworn to and subscribed before me, this the _24th_ day of _August_ 2005.

SUSANNE REESE
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Nov. 13, 2006

_Susanne Reese_

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ALAN D. BARR and  
JOHN MALANDRUCCOLO, JR.,  

    Plaintiffs,  

v.   :   Civil Action No. 04-1468

CARPENTERS PENSION AND ANNUITY  
PLAN OF PHILADELPHIA AND  
VICINITY, successor by merger to  
CARPENTERS LOCAL 626 PENSION  
AND ANNUITY PLAN,  

    Defendant.

## DECLARATION OF KENT CPREK

Kent Cprek states under penalty of perjury:

1. I am shareholder in the firm of Jennings Sigmond, P.C. which represents the Defendant(s) in this action.

2. I was also principally responsible for the firm's work with the Carpenters Local 626 Pension & Annuity Plan ("Local 626 Plan") from the early 1990s forward up to its merger (and beyond for the merged plan). In that role, I and my firm received and collected the documents and instruments governing the Local 626 Plan and have archived them in our regular business records. I make this Declaration for the purpose of ministerial identification and authentication of a plan document in support of Defendant's motion for summary judgment.

3.  Attached as Exhibit 19 is a true copy of the cover page, Article IV, Section 4, and signature pages, pp. 1, 13, 14, 26 of the Agreement and Declaration of Trust for the Local 626 Plan as in effect during 2002 to the plan's merger on August 31, 2004. If counsel for Plaintiffs does not already have a full copy of the agreement, we will provide it on request.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _September 29, 2005_

_____
KENT CPREK

AGREEMENT AND DECLARATION OF TRUST
Between
ALLIED DIVISION OF DELAWARE CONTRACTORS ASSOCIATION, INC.
and
LOCAL NO. 626 OF THE UNITED BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA
Establishing the
LOCAL NO. 626 UNITED BROTHERHOOD OF CARPENTERS AND JOINERS
OF AMERICA PENSION FUND

THIS AGREEMENT AND DECLARATION OF TRUST, originally executed the 22nd day of February, 1967, is restated and executed this 25th day of October, 1977 by and between ALLIED CONSTRUCTION INDUSTRIES OF DELAWARE, INC., party of the first part (hereinafter referred to as "Employers") and LOCAL NO. 626 OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, (hereinafter referred to as the "Union"), party of the second part.

WITNESSETH:

WHEREAS, the Employers and the Union, in a collective bargaining agreement between them dated May 1, 1965, provided for employer contributions to a pension trust fund for the benefit of the employees of the individual employers of the above-named Employer organization and

WHEREAS, said collective bargaining agreement provides that said contribution shall be payable into a trust fund established and administered by a Board of Trustees comprised of an equal number representing the Employers and the Union respectively, and

WHEREAS, the purpose of this Trust Agreement is to provide for the establishment and administration of such Fund for the purpose of paying from principal and/or income, for the benefit of employees, their families and dependents, for retirement benefits, and

-1-

by Law. Said bonds shall be obtained from a surety company qualified to do business by the Delaware Insurance Department as the Board shall determine. The cost of the premiums of such bonds shall be paid out of the Fund.

## ARTICLE IV
### FUNCTIONS AND POWERS OF BOARD OF TRUSTEES

Section 1. The Trustees shall be charged with the duty and shall be empowered to administer the Trust Fund and to carry out the provisions of this Agreement and the rules and regulations issued thereunder. Trustees may, without changing the objective thereof, amend or modify this Agreement in such manner as they determine will promote efficiency, economy, better coverage or better services for those affected thereby.

Section 2. The Trustees shall be fiduciaries and subject to the requirements of the Employee Retirement Income Security Act of 1974. Notwithstanding any other provision of this agreement and to the fullest extent permitted by law, the Trustees shall in their sole and exclusive discretion have the right and power to delegate to an Administrator the responsibility for the performance of any and all duties or obligations with which they are charged by the terms of this Agreement.

Section 3. The Employers and the Union irrevocably grant power of attorney to the Trustees now in office or subsequently appointed, to establish and administer the Fund as the representative of said parties and with full authority to act for them as their representatives in the administration of said Fund, which shall be administered for the sole and exclusive benefit of employees and/or their beneficiaries, either through policies or insurance issued by a licensed insurance carrier or on a self-insured basis, or both, as

the Trustees shall elect and determine.

Section 4. The Board of Trustees shall have the power to construe all provisions of this agreement and the rules and regulations issued thereunder, and the terms used therein and any construction adopted by the Board of Trustees in good faith shall be binding upon the Union, Employers and any signatory associations and individual employers and employees and beneficiaries thereof.

Section 5. The Board of Trustees shall collect and receive all contributions due to the Fund, and shall deposit such contributions in a special trust fund account or accounts, established in reputable banks or savings institutions, located in the city and county of the principal office of the Fund, or such other locations as the Board of Trustees may direct.

Section 6. The Board of Trustees shall have the power to enforce payment of contributions in the manner elsewhere provided for herein.

Section 7. The Board of Trustees is authorized to do all things necessary, reasonable or convenient to carry out their responsibilities as herein provided, and shall have the power, but shall not be limited by this enumeration, to do the following things:

    a. To employ executive, consultant, administrative, actuarial, clerical, secretarial, and legal personnel;

    b. To incur necessary expenses for office space, supplies and administration;

    c. to compromise and settle claims, both in favor of and against the Fund;

Fund to some other trust, to be administered as part of such other trust, provided that the purposes of such other trust are substantially the same as the purposes of this Trust and that such transfer does not have the effect of defeating the purposes for which the Fund is held.

Section 4. Except where otherwise provided by applicable law, upon the termination of the Trust herein provided any and all monies remaining in the Fund after the payment of all expenses shall be used for the continuance of the benefits provided in the rules and regulations relating to benefits, until such monies have been exhausted.

Section 5. In all amendments and/or changes to the rules, By-Laws and regulations, notices by mail shall be sent to the Trustees one week prior to the meeting. There must be an equal number of Employer and Union Trustees' votes present or represented in order for such amendments and/or changes to become effective.

EXECUTED on the 25th day of October, 1977.

FOR THE EMPLOYERS:
ALLIED CONSTRUCTION INDUSTRIES OF DELAWARE, INC.

BY: _____

FOR THE UNION:
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL NO. 626

BY: _____

-26-

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2005, I electronically filed a true and correct copy of the Appendix to Defendants' Opening Brief in Support of Defendants' Motion for Summary Judgment using CM/ECF, which will send notification that such filing is available for viewing and downloading. I further certify that on September 30, 2005, I caused a copy of Appendix to Defendants' Opening Brief in Support of Defendants' Motion for Summary to be served on the following counsel of record in the manner indicated below:

### HAND DELIVERY

Joseph M. Bernstein, Esquire
800 North King Street, Suite 202
Wilmington, DE 19801

/s/ Timothy J. Snyder
Timothy J. Snyder (No. 2408)